1

2

3

4

5

6                           UNITED STATES DISTRICT COURT

7                                DISTRICT OF NEVADA

8                                      * * *

9   UNITED STATES OF AMERICA,           )
                                        )
10                   Plaintiff,          )          3:11-CR-00094-LRH-VPC
                                        )
11  v.                                  )
                                        )          ORDER
12  ALBERT THOMAS WENDFELDT,            )
                                        )
13                   Defendant.          )
    _____ )

14

15          Before the Court is Defendant Albert Thomas Wendfeldt's ("Wendfeldt") Motion to

16  Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody Pursuant to 28 U.S.C.

17  § 2255. Doc. #36.[1]  The United States filed a Response (Doc. #40), to which Wendfeldt did not

18  reply.  After the Court ordered an evidentiary hearing (Doc. #41), Wendfeldt filed a Memorandum

19  in Support of his Motion to Vacate (Doc. #44), to which the United States replied (Doc. #45).  The

20  Court held an evidentiary hearing on October 27, 2014, during which the Court viewed the video of

21  Wendfeldt's driving and the traffic stop at issue and heard testimony from the arresting officer and

22  an expert witness called by the defense.

23  **I.    Factual Background**

24          Shortly before 10:40 p.m. on July 11, 2011, Nevada Highway Patrol ("NHP") Trooper Eric

25  Lee ("Trooper Lee") observed Wendfeldt's vehicle, which was traveling westbound in the outside

26
    _____

         [1] Refers to the Court's docket entry number.

lane of Interstate 80 near Reno, drive onto the north fog line several times within one mile.  In his report, Officer Lee noted that the driver of the vehicle had violated Nevada Revised Statute ("NRS") 484.305,[2] which provides that "[i]f a highway has two or more clearly marked lanes for traffic traveling in one direction, vehicles must: (a) Be driven as nearly as practicable entirely within a single lane."  Trooper Lee activated his emergency lights and effected a traffic stop at approximately 10:40 p.m.  Upon making contact with Wendfeldt, Trooper Lee informed Wendfeldt that he stopped him because he was concerned that he may have been drinking and driving or possibly falling asleep behind the wheel.  Wendfeldt explained that he had been driving all day and was only trying to get to Reno.  Trooper Lee then asked "did you notice that you were having a hard time staying in the lane?"  Wendeldt responded "no."  Wendfeldt added that he was driving toward the right side of his lane because Trooper Lee was immediately behind him in the inside lane to the left.

While Wendfeldt was retrieving his license and registration, Trooper Lee observed that the interior of the vehicle had a "lived-in" appearance, with trash, clothing, and other items scattered about the vehicle.  After Wendfeldt located the requested documentation, Trooper Lee conducted a weapons frisk.  In response to Trooper Lee's inquiry about previous trouble with law enforcement, Wendfeldt responded that his only trouble had been for driving under the influence.

Trooper Lee requested a records check on Wendfeldt at approximately 10:44 p.m.  While waiting for the records check to return, Trooper Lee asked Wendfeldt a number of questions—primarily concerning his travels and occupation.  At 10:53 p.m., Wendfeldt asked if they were done yet.  Thereafter, Trooper Lee indicated that Wendfeldt's driver's license check had come back and Trooper Lee told Wendfeldt that he was free to leave.  As Wendfeldt was walking back to his car, Trooper Lee reinitiated questioning and asked "do you have anything illegal inside the car?"  Wendfeldt responded "no sir."  Trooper Lee then asked Wendfeldt if he had any

---

[2] NRS 484B.223(1) was substituted in revision for 484.305(1).

marijuana, heroin, cocaine, ecstasy, methamphetamines, or large sums of money.  Wendfeldt

responded "no sir" to each of these questions.  At approximately 10:55 p.m., Trooper Lee asked

"can I search your vehicle?"  Wendfeldt responded "no sir."  Trooper Lee then said "why don't you

stand right over there," referring to a location away from his vehicle and near the police vehicle.

Next, Trooper Lee returned to his patrol car and took out his canine "Petey." He then walked the

dog to Wendfeldt's vehicle, circled the vehicle, and the dog positively alerted in the area of a

passenger door.  Trooper Lee then detained Wendfeldt and obtained a search warrant.  A search of

locked containers in the trunk of the vehicle yielded discovery of sixty-five grams of

methamphetamine, plastic bags, a digital scale, two handguns, and a shotgun.

On August 10, 2011, Wendfeldt was indicted by a federal grand jury on one count of

Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1)

and 841(b)(1)(A)(viii).  Doc. #1.  On August 30, 2011, federal public defender Cynthia S. Hahn

("Hahn") was appointed counsel for Wendfeldt.  Doc. #11.  On February 2, 2012, Wendfeldt

withdrew his previous plea of not guilty and entered a plea of guilty.  Doc. #20.  In the Plea

Agreement, Wendfeldt stipulated to the following:

> A Nevada Highway Patrol officer conducted a traffic stop of the defendant's vehicle
> on Interstate 80 on July 11, 2011.  After a drug detection dog alerted on the
> defendant's vehicle, a search warrant was obtained for the vehicle.  During a search
> of the vehicle trunk, the officer found approximately 65 grams of actual
> methamphetamine and three firearms.  These items were found in locked containers.

Doc. #21 at 5.  On May 11, 2012, the Court entered judgment against Wendfeldt and sentenced him

to a mandatory minimum of 120 months imprisonment to be followed by five years' supervised

release.  Doc. #26.

## II.    Legal Standard

Nevada law states that in a highway with two or more lanes, vehicles must "[b]e driven as

nearly as practicable entirely within a single lane."  NRS 484B.223(1).  An infraction involving a

minor cross over a fog lane does not by itself create reasonable suspicion to justify a traffic stop.

*United States v. Delgado-Hernandez*, 283 Fed. Appx. 493, 498-99 (9th Cir. 2008) (holding that the

1   stop was unreasonable where the defendant crossed over the fog line twelve to fourteen inches and

2   did not endanger other motorists).

3       It is well settled that a traffic stop is a seizure within the meaning of the Fourth

4   Amendment.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *see also Whren v. United States*,

5   517 U.S. 806, 809-10 (1996).  The Ninth Circuit has held, in the context of an investigatory traffic

6   stop, that an officer need only have reasonable suspicion to justify the seizure.  *See United States v.*

7   *Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (concluding that *Whren* did not alter the law

8   that reasonable suspicion is enough to support an investigatory traffic stop under the Fourth

9   Amendment); *see also Brendlin v. California*, 551 U.S. 249, 263 (2007) (concluding that a seizure

10  begins at the moment the car comes to a halt on the side of the road).  Reasonable suspicion

11  requires "specific, articulable facts which, together with objective and reasonable inferences, form

12  the basis for suspecting that the particular person detained is engaged in criminal activity."  *United*

13  *States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia-Camacho*,

14  53 F.3d 244, 246 (9th Cir. 1995)).  In assessing the legality of an investigative stop, courts must

15  consider the "totality of the circumstances."  *United States v. Cortez*, 449 U.S. 411, 417 (1981).

16       Pursuant to 28 U.S.C. § 2255, a prisoner may move the court to vacate, set aside, or correct

17  a sentence if "the sentence was imposed in violation of the Constitution or laws of the United

18  States, or . . . the court was without jurisdiction to impose such sentence, or . . . the sentence was

19  in excess of the maximum authorized by law, or is otherwise subject to collateral attack."

20  28 U.S.C. § 2255.  A petitioner can base a § 2255 motion on the ineffective assistance of counsel

21  prior to conviction or a plea deal.  *Strickland v. Washington*, 466 U.S. 668, 684 (1984).  If the

22  Court determines that a motion to suppress would have been meritorious, the Court must then

23  consider whether failure to file such a motion constituted ineffective assistance of counsel. *See*

24  *Strickland*, 466 U.S. at 686.  In order to prevail on an ineffective assistance of counsel claim, the

25  petitioner has the burden of proving two elements.  "First, the defendant must show that counsel's

26  performance was deficient," meaning that counsel was not functioning as a competent advocate.

4

1    *Id.* at 687.  "Second, the defendant must show that the deficient performance prejudiced the

2    defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of

3    a fair trial."  *Id.*  The Court "must indulge a strong presumption that counsel's conduct falls within

4    the wide range of reasonable professional assistance."  *Id.* at 689.

5    **III.    Discussion**

6        **A.        Likelihood of Success**

7            At issue first is whether the investigatory traffic stop ran afoul of the Fourth Amendment

8    such that Wendfeldt would have succeeded had his counsel filed a motion to suppress.  Wendfeldt

9    contends that (1) the initial investigative traffic stop was not supported by reasonable suspicion, (2)

10   the police questioning during the initial seizure was unreasonable, and (3) the subsequent external

11   canine search of his vehicle was not supported by reasonable suspicion.

12                    **1.   Initial Traffic Stop**

13           Trooper Lee articulated one observed traffic violation—failure to maintain a travel lane—to

14   justify the investigatory traffic stop.  Doc. #45-1, Ex. A.  Specifically, the trooper observed

15   Wendfeldt's vehicle "drive onto the north fog line multiple times within one mile, as it traveled in

16   the #2 westbound travel lane, which was contrary [to] and in violation of [NRS 484B.223]."  *Id.*

17   Although the Nevada Supreme Court has not interpreted NRS 484B.223 on this issue,[3] other courts

18   have held that a minor, isolated crossing of a lane line does not violate a statute requiring a driver

19   to safely maintain his or her travel lane.  In *Delgado-Hernandez*, the Ninth Circuit concluded that

20   the defendant did not violate NRS 484B.223(1) by briefly crossing over the fog line approximately

21   twelve to fourteen inches one time.  283 Fed. Appx. at 496-99.  The Ninth Circuit found significant

22   the fact that the defendant was not speeding or otherwise driving in an erratic manner.  *Id.* at 497-

23   98.  In *United States v. Lopez-Rojo*, No. 3:07-cr-0080, 2008 WL 2277495, at *5 (D. Nev. May 29,

24

25           [3] The Nevada Supreme Court has stated that "the gravamen of a charge for violating [NRS
     484B.223(1)] is that the driver changed a direct course of travel without giving the proper signal."  *Nevada v.
26   Eighth Judicial Dist. Court*, 994 P.2d 692, 699 (Nev. 2000).

1  2008), this Court found that "[a]lthough the Nevada Supreme Court—or any other Nevada

2  court—has not issued a opinion regarding what constitutes a failure to maintain a traffic lane,

3  persuasive authority weighs in favor of finding that crossing over, as opposed to touching, a fog

4  line constitutes [a violation of NRS 484B.223(1)]."  Moreover, In *United States v. Raileanu*, No.

5  2:13-cr-0038, 2013 WL 6913252, at *2 (D. Nev. Dec. 30, 2013), the U.S. District Court for the

6  District of Nevada concluded that the defendant did not violate NRS 484B.223(1) when he crossed

7  over the fog line three times in one-quarter of a mile.  Further, the court found that because the

8  officer was mistaken about what constituted a violation of the law, reasonable suspicion was

9  lacking and the stop was not justified.  *Id.*

10  The Court finds the reasoning in the aforementioned cases to be persuasive, and notes that

11  Wendfeldt's conduct falls short of the conduct that these courts determined *could not* justify

12  reasonable suspicion because Wendfeldt merely touched the line, and never crossed it.  The Court

13  benefits from having viewed the video of Wendfeldt's driving and the stop at the evidentiary

14  hearing.  Although Wendfeldt's right tires touched the fog line several times, he was not speeding

15  or driving erratically in any way, and his driving posed no danger to any other motorists.

16  Wendfeldt's driving appears reasonable in light of the fact that a police vehicle was positioned in

17  Wendfeldt's blind spot in the parallel inside lane for an extended period of time.  It is reasonable

18  for a driver to drive to the outside of his traffic lane when another vehicle is positioned to the side

19  and behind the driver's vehicle in the inside lane.  Additionally, Wendfeldt expressed to Trooper

20  Lee in the opening seconds of their conversation following the traffic stop that the presence of the

21  police vehicle was a reason that he moved toward the right side of the outside lane.

22  Thus, although Trooper Lee claimed that he initiated a traffic stop for "the safety of the

23  innocent motoring public," there is no indication that Wendfeldt was driving unlawfully,

24  erratically, or in an otherwise unsafe manner.  Additionally, the United States' contention that

25  "other relevant circumstances, including the late night hour and [Trooper Lee's] suspicion that

26  Wendfeldt may have been impaired or falling asleep," does not appear to be supported by any

6

objective evidence other than Wendfeldt's observed driving patterns, which did not violate NRS 484B.223(1).  *See* Doc. #45 at 6.  The Court therefore does not find that Wendfeldt's conduct invited suspicion that, under a totality of circumstances, justified Trooper Lee's stop.  As such, Trooper Lee did not have the requisite reasonable suspicion necessary to justify the traffic stop at its inception.

Even if Trooper Lee was mistaken in good faith about whether Wendfeldt's driving violated NRS 484B.223(1), this does not transform the unlawful traffic stop into a lawful one.  *See United States v. King*, 244 F.3d 736, 739 (9th Cir. 2001) (finding that even "a good faith mistake of law by an officer cannot form the basis for reasonable suspicion"); *see also United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (a mistake of law occurs when an officer believes that the suspected conduct is illegal even though the law does not actually prohibit it).  Because the Court finds that the original stop was deficient, and that a motion to suppress would have been meritorious on this ground, the Court need not consider questions related to the remainder of the traffic stop.  *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained during or as a direct result of an unlawful invasion.").  However, the Court considers Wendfeldt's arguments regarding the reasonableness of his detention below.

### 2.  Questioning During Initial Seizure

Wendfeldt also challenges the legality of his "prolonged detention," which he argues exceeded the scope and duration of the purported justification for the initial investigatory traffic stop.  Doc. #44 at 7-9.  To determine whether a detention is longer than justified under the circumstances, "it is appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly."  *United States v.*

*Sharpe*, 470 U.S. 675, 686 (1985).  "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably* extend the duration of the stop."  *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

Assuming *arguendo* that the initial stop was permissible, the Court finds that although Trooper Lee asked Wendfeldt many questions unrelated to driving, such questions were permissible under *Sharpe and Johnson* because they did not unreasonably prolong the length of the stop.  Trooper Lee called Wendfeldt's license and registration in to dispatch and asked all questions while waiting eight to ten minutes for a response.  Once dispatch responded, Trooper Lee immediately shook Wendfeldt's hand and told him that he was free to go.  This was not an unreasonably long traffic stop under controlling precedent.  *See Muehler v. Mena*, 544 U.S. 93, 94 (2005) (finding that questioning that does not prolong a lawful stop is not an additional seizure that requires separate reasonable suspicion); *United States v. Mendez*, 476 F.3d 1077, 1081 (9th Cir. 2007) (holding that questioning outside the scope of the reason for stopping an individual "need not have been supported by separate reasonable suspicion").

### 3.  Second Seizure

Whether Trooper Lee unreasonably prolonged the stop by asking additional pointed questions regarding illegal possession after telling Wendfeldt that he was free to leave is a more difficult question.  The Nevada Supreme Court directly addressed the issue of whether it is legal for an officer to conduct a second seizure after telling the driver that he can leave in *State v. Beckman*, 305 P.3d 912 (Nev. 2013) (en banc).  *Beckman* involved a traffic stop of an individual who was stopped for speeding.  *Id*. at 914.  After verifying Beckman's license and registration, the officer told him that "everything checks good" and issued a warning.  *Id*.  When Beckman began to leave, the officer ordered him to stay until a drug-sniffing dog arrived at the scene.  *Id*.  When the canine arrived, it alerted to the presence of drugs, which was confirmed by a subsequent warrantless search of the vehicle.  *Id*.  The Court affirmed suppression of the evidence, holding that after telling an

individual that he is free to leave, a prolonged search "may be reasonable in three limited circumstances: when the extension of the stop was consensual, the delay was de minimis, or the officer lawfully receives information during the traffic stop that creates a reasonable suspicion of criminal conduct." *Id.* at 917. The Court acknowledges that a decision of a state Supreme Court is not binding authority on this question. However, the Court finds that *Beckman* is persuasive, and that applying the principles of *Beckman* to the present facts supports the court's conclusion that Wendfeldt's second seizure was unlawful.[4]

First, there was no consent for the search of Wendfeldt's vehicle. The *Beckman* Court noted that any argument that consent existed for the search evaporated when Beckman asked "can I please go" and the officer responded "absolutely not." *Id.* at 918. Wendfeldt's statement refusing consent to search his vehicle was similarly unambiguous. After Trooper Lee told Wendfeldt that he was free to go and Wendfeldt started toward his car, the trooper asked "can I search your vehicle?" Wendfeldt responded "no sir." At this point, Trooper Lee said "why don't you stand right over there," referring to a location away from Wendfeldt's vehicle and near the patrol vehicle. Trooper Lee then obtained his canine from his patrol car, walked the dog arounds Wendfeldt's vehicle, and the dog positively alerted while on the right passenger side of the vehicle. The Court is particularly troubled that Wendfeldt's refusal to consent appears to be a factor in Trooper Lee's decision to conduct the dog sniff. Trooper Lee stated at the evidentiary hearing that he did not intend to issue Wendfeldt a citation throughout the initial stop, and it is clear that the Trooper told Wendfeldt that he was free to go. It was not until Wendfeldt refused to consent to a search that Trooper Lee told him to stand aside so that he could conduct a dog sniff. Individuals have a right to refuse consent for a search, and the existence of this right requires that denial of consent not be a basis for reasonable suspicion. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 270-71 (1973) (finding that a search of a suspect's vehicle without probable cause or consent violates the Fourth

---

[4] *Beckman*, an en banc decision of the Nevada Supreme Court, based its reasoning largely on an exhaustive analysis of federal case law, substantially from the United States Supreme Court and the Ninth Circuit Court of Appeals.

Amendment); *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 841 (9th Cir. 2003), *abrogation on other grounds recognized by C.B. v. City of Sonora*, No. 11-17454, 2014 WL 5151632, at *12 n.12 (9th Cir. Oct. 15, 2014) (finding that refusal "to consent to a search cannot be a basis for the arrest unless [the officer] had a right to search" independent of the refusal); *Gasho v. United States*, 39 F.3d 1420, 1439 (9th Cir. 1994) (noting that refusal to consent to a search "could not serve as a basis for finding criminal intent"); *United States v. Prescott*, 581 F.2d 1343, 1351 (9th Cir. 1978) (finding that refusing to consent to a search cannot be a crime, "[n]or can it be evidence of a crime").

Second, the United States argues that the second seizure was *de minimus* because Trooper Lee had a canine in his vehicle and was able to conduct the dog sniff quickly, adding only a few minutes to the time of the stop.  Doc. #45 at 10.  The dog sniff occurred approximately two and a half minutes after Trooper Lee told Wendfeldt that he was free to leave.  Although the second seizure here was not as long as the nine-minute delay in *Beckman*, the Court finds that it still was not *de minimus* under the circumstances present here.  A drug sniff conducted during a legal traffic stop is not a search so long as it does not unreasonably prolong the stop.  *Illinois v. Caballes*, 543 U.S. 405, 407-08 (2005).  Courts have been reluctant to set a specific time limit for what would constitute unreasonable delay.  *See United States v. Turvin*, 517 F.3d 1097, 1102-03 (9th Cir. 2008) (discussing what would constitute unreasonable delay and declining to adopt a bright-line rule).

The Court benefits from having viewed the video of Wendfeldt's stop.  The video shows Wendfeldt waiting patiently for nearly thirteen minutes while Trooper Lee waited for a response from dispatch regarding the license and registration check.  Wendfeldt did not appear more nervous than any citizen might be after being frisked for weapons and then being questioned for more than ten minutes at night on the side of the road by a trooper.  After asking many questions of Wendfeldt, very few related to his driving, Trooper Lee concluded that Wendfelt was free to leave when dispatch reported nothing irregular following the license and registration check.  Because the Court does not believe that any reasonable suspicion existed to continue interrogating Wendfeldt

once he had been told he could leave, the Court finds that Trooper Lee's additional pointed questions regarding whether Wendfeldt had illegal contraband, and then directing him to stand to the side of the patrol vehicle when Wendfeldt refused to consent to a search, were not *de minimus*.

Third, the Court is not persuaded by the United States' argument that the initial stop gave Trooper Lee reasonable suspicion of criminal conduct. The United States argues that four factors that occurred during the traffic stop contributed to Trooper Lee's reasonable suspicion: "1) Wendfeldt's uncontrolled shaking as he provided his vehicle documentation; 2) trash, clothing, and miscellaneous items scattered throughout Wendfeldt's car, which is consistent with drug transporters . . . ; 3) Wendfeldt's vague, indefinite, and conflicting statements about his travel plans; and 4) Wendfeldt's failure to fully disclose his prior encounters with law enforcement." Doc. #45 at 11. Courts often rely on conclusions of police officers because their experiences enable them to notice factors that "might well elude an untrained person." *Cortez*, 449 U.S. at 418. "Factors such as nervousness are part of a reasonable suspicion analysis but, standing alone, carry little weight because many citizens become nervous during a traffic stop, even when they have nothing to hide." *Beckman*, 305 P.3d at 918 (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002)).

Again, the Court benefits from having viewed the video of Wendfeldt's stop. First, even assuming that Trooper Lee noticed some factors in person that did not translate on the video, the video does not show any indication of "uncontrolled shaking" or that Wendfeldt was more nervous than many citizens might be while stopped by a Trooper on the side of the road at night.[5] *See United States v. Chavez-Venezuela*, 268 F.3d 719, 725 (9th Cir. 2001), *overruled on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005) ("[I]t is common for most people to exhibit signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity.") Second, Wendfeldt explained to Trooper Lee that he was driving to

---

[5] After frisking Wendfeldt for weapons and nine minutes into the stop, Trooper Lee said "you seem nervous" after Wendfeldt asked why Trooper Lee was asking so many questions. Wendfeldt responded "I have no reason for standing here, and I don't know what you're doing."

11

Washington State to visit his children; such a long drive would justify the presence of clothing or other miscellaneous items in Wendfeldt's car.[6]  Third, the Court finds that Wendfeldt's stated travel plans were not so vague as to arouse the additional suspicion necessary to justify a second seizure after telling Wendfeldt that he was free to go.  *See United States v. Sokolow*, 490 U.S. 1, 2 (1989) (noting that odd travel schedules can be "quite consistent with innocent travel").  Fourth, although it is true that Wendfeldt told Trooper Lee that he had a prior DUI conviction while concealing that he had a prior misdemeanor drug charge, this alone is not enough to create reasonable suspicion under these circumstances.  *United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) ("[A] prior criminal history alone cannot establish reasonable suspicion.").

The Court acknowledges that even if individual factors would not justify reasonable suspicion, many factors can contribute to a finding of reasonable suspicion based on the officer's training and experience.  *See Sokolow*, 490 U.S. at 9 (finding that any one of the cited factors was not by itself proof of illegal conduct, but taken together they amounted to reasonable suspicion).  Under these facts, however, and the fact Trooper Lee had no reasonable suspicion to conduct the initial stop, the Court finds that the totality of circumstances does not support Trooper Lee's finding that reasonable suspicion existed for the second seizure.  *See United States v. Sigmond-Ballesteros*, 258 F.3d 1117, 1127 (9th Cir. 2001) (finding no reasonable suspicion under totality of circumstances where officer cited a lane change and move off the main road, hand gestures in the vehicle, notoriety of the route for smuggling, proximity to border, and missing rear seat, among other factors, to support reasonable suspicion); *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1418-19 (9th Cir. 1989) (finding no reasonable suspicion based on the totality of circumstances where the officer based his suspicion on nervous demeanor of driver and passengers,

---

[6] Wendfeldt told Trooper Lee that he was traveling from Arizona to Seattle to visit his two children, who live in Eastern Washington and Seattle.  In response to questions by Trooper Lee, the sixty-one year old Wendfeldt responded that he would be  in Washington State for one to two weeks, and that his children were expecting him.  When asked why he was driving rather than flying to Seattle, Wendfeldt responded that he wanted to give the car to his daughter as a gift and that he would fly on his return trip.

sudden reduction of speed upon noticing police officer, presence of two-way antenna on the vehicle, defendant's residence in an area known for narcotics activity, license plate bracket indicating purchase of car at a dealership known for drug trafficking, and the size of defendant's truck as evidence supporting reasonable suspicion).

In a recent civil forfeiture case, this Court held that an officer's prolonged interrogation was reasonable under the totality of circumstances because the officer reported six total factors that contributed to his reasonable suspicion: 1) noticing the smell of marijuana; 2) strong odor of air freshener in the vehicle; 3) expired rental agreement; 4) unusually nervous and frantic demeanor; 5) prior conviction for drug trafficking; and 6) odd travel plans and stressed reaction to questions regarding said travel plans. *United States v. $102,836.00*, 9 F. Supp. 3d 1152, 1161 (D. Nev. 2014). That case is distinguishable for two reasons. First, the individual was initially stopped for speeding and an obstructively-placed Global Positioning System device on the windshield; the arrest was therefore not, as here, predicated on a faulty initial stop. Second, under the totality of circumstances analysis, the officer in *$102,836.00* observed significantly more evidence to support his finding of reasonable suspicion.[7] Here, the totality of the circumstances analysis is insufficient to show that Trooper Lee had more than an "inchoate and unparticularized suspicion" of Wendfeldt's criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Motley*, 344 Fed. Appx. 445, 448 (9th Cir. 2009) (finding that a traffic stop that "revealed no independent evidence of illicit narcotics activity" did not establish reasonable suspicion).

Because of the foregoing, the Court finds that Wendfeldt's second seizure was not supported by consent, was not *de minimus*, and was not supported by additional reasonable suspicion. Accordingly, even if the initial traffic stop were justified, prolonging the interrogation

---

[7] The officer smelled marijuana on the suspect's person during the stop, and the suspect told the officer that he had a prior record for drug trafficking. *$102,836.00*, 9 F. Supp. 3d at 1155. The officer also stated that the existence of an expired vehicle rental agreement is common for drug traffickers. *Id.* Finally, the suspect's nervousness was much more pronounced: he "repeatedly put his hands into his pockets and then removed them, was pacing in front of [the officer] and kicking the dirt beneath his feet, and exhibited other signs of undue stress." *Id.* at 1160.

of Wendfeldt after saying he was free to leave was impermissible.  Because evidence against Wendfeldt never would have been discovered but for the illegal traffic stop, the failure of Wendfeldt's counsel to file a motion to suppress prejudiced Wendfeldt's defense and had a substantial impact on the result.  *See Strickland*, 466 U.S. at 694 (finding that ineffective assistance of counsel only applies when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

**B.    Application of § 2255**

If the Court determines that an individual's conviction is premised on a faulty stop, a § 2255 motion must still be dismissed if counsel's decision not to use a particular litigation tactic was strategic.  *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1985) ("Only those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ and will be entitled to retrial without the challenged evidence.").  The United States argues that regardless of whether the Court determines that Trooper Lee had reasonable suspicion for the stop, the Court must deny Wendfeldt's § 2255 motion unless Wendfeldt shows that "his prior attorney's failure to litigate that claim was the result of gross negligence."  Doc. #45 at 12.  The United States argues further that Wendfeldt's counsel's decision not to file a motion to suppress was strategic—not indicative of "gross incompetence"—because an unsuccessful motion could have resulted in a longer sentence for Wendfeldt.  *Id.*  The Court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011).  This "strong presumption" also requires the Court to deem that "counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'"  *Id.* at 790.

If convicted, Wendfeldt faced a mandatory minimum of 120 months in prison.  Doc. #26.  The United States argued in its pleadings and at the evidentiary hearing that because Wendfeldt faced the possibility of a shorter sentence for pleading guilty (the difference between 135 to 168 months and 121 to 151 months), the decision not to file a motion to suppress may have been

strategic.  Doc. #45 at 12.  But the record does not indicate that Wendfeldt's counsel took any measures to maintain a strong bargaining position in negotiations with the United States.  If, for example, counsel had filed a motion to suppress and then withdrawn it after the United States agreed to a favorable sentence, then this would be indicative of strategy rather than ineffective assistance.  Defendant states that his counsel never even considered the possibility of filing a motion to suppress.  Doc. #36 at 4.  The only apparent negotiation that counsel engaged in appears to be for application of a safety valve that was not in fact possible under controlling case law.  *Id.* at 6; s*ee United States v. Yepez*, 704 F.3d 1087, 1091 (9th Cir. 2012) (en banc) (reversing application of safety valve for individual who had only nonviolent prior offenses in strict reliance on the requirement that an individual meet all five factors in the safety valve statute).  Based on the record, however, it appears that Wendfeldt's counsel made no attempt to garner a bargaining position against the United States despite the likelihood of success of a motion to suppress and the fact that Wendfeldt faced a mandatory minimum sentence of ten years.

"[A] single, serious error may support a claim of ineffective assistance of counsel." *Kimmelman*, 477 U.S. at 383.  In *Premo v. Moore*, the Supreme Court held that under *Strickland*, the defendant's attorney's effectiveness was not constitutionally deficient despite the failure to move to suppress a taped confession.  562 U.S. 115, 131 S. Ct. 733, 743 (2011).  This reversed an en banc decision of the Ninth Circuit Court of Appeals stating that considering the application of a mandatory minimum sentence, "we cannot conclude that counsel's failure to move to suppress [the defendant's] formal, taped confession was harmless." *Moore v. Czerniak*, 574 F.3d 1092, 1113 (9th Cir. 2009), *overruled by Moore*, 131 S. Ct. at 743.  In addition to stating that the motion to suppress Moore's confession might have been fruitless, the Supreme Court noted that the defendant's "decision to plead no contest allowed him to avoid a possible sentence of life without parole or death." *Moore*, 131 S. Ct. at 744.

Understanding the importance of *Strickland*'s deferential standard, the Court declines to follow the result of *Moore* for two reasons.  First, as discussed *supra*, the Court finds that had

Wendfeldt's attorney filed a motion to suppress, it would have been successful.  Second, Wendfeldt did not receive substantial benefits from his plea bargain comparable to *Moore*, given that he faced a mandatory minimum of 120 months regardless of the terms of the plea bargain.  Under these facts, the Court finds that Wendfeldt's counsel's decision not to file a motion to suppress was objectively unreasonable, and that this decision prejudiced Wendfeldt.  *See Strickland*, 466 U.S. at 687-88 ("When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.").

Accordingly, given the problems associated with Wendfeldt's initial stop and the unreasonable nature of Trooper Lee's decision to prolong the stop after telling Wendfeldt that he was free to leave, the Court finds that the failure to file a motion to suppress surpassed mere strategy.  In light of the sparse evidence against Wendfeldt absent the traffic stop and long sentence that Wendfeldt faced if convicted, failure to file a motion to suppress was objectively unreasonable and constituted ineffective assistance of counsel under § 2255.

**IV.     Conclusion**

The Court concludes that Wendfeldt has satisfied the requirements to establish ineffective assistance of counsel under § 2255, even in light of the strict standard established by *Strickland*. First, the Court finds that a motion to suppress would have been meritorious.  Second, Wendfeldt's counsel's attorney was deficient in neglecting to file a motion to suppress.  Finally, the ineffective assistance of counsel prejudiced Wendfeldt's defense because without the evidence conducted as a result of the illegal search, there is a strong likelihood that he never would have been convicted.

IT IS THEREFORE ORDERED that Wendfeldt's Motion to Vacate under 28 U.S.C. § 2255 (Doc. #36) is GRANTED.

IT IS SO ORDERED.

DATED this 7th day of November, 2014.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE